**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BENJAMIN COLE,

      Petitioner - Appellant,

v.

No. 11-5133

ANITA TRAMMELL, Warden, Oklahoma
State Penitentiary,

      Respondent - Appellee.
_____

**ORDER**
_____

Before **BRISCOE**, Chief Judge, **LUCERO** and **HOLMES**, Circuit Judges.
_____

This matter is before the court on Appellant's *Petition for Rehearing and Request for En Banc Consideration*. We also have a response from the Appellee.

Upon consideration, rehearing is granted in part by the panel assigned to this matter originally. An amended opinion is attached to this order, and rehearing is granted to the extent of the amendments found on pages 36-39. The original opinion filed on November 18, 2013 is withdrawn, and the amended version shall be substituted as the decision of the court.

The petition for rehearing and request for en banc consideration were also transmitted to all of the judges of the court who are in regular active service. As no

member of the panel and no judge in regular active service on the court requested that the court be polled, the request for en banc consideration is denied.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

February 18, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BENJAMIN COLE,

      Petitioner-Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,

      Respondent-Appellee.

No. 11-5133

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:CV-08-00328-CVE-PJC)**

Thomas Kenneth Lee, Assistant Federal Public Defender, (Robert S. Jackson, Assistant Federal Public Defender, with him on the briefs), Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer J. Dickson, Assistant Attorney General, (E. Scott Pruitt, Attorney General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellant.[*]

Before **BRISCOE,** Chief Judge, **LUCERO** and **HOLMES**, Circuit Judges.

**BRISCOE**, Chief Judge.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Anita Trammell, who was appointed Warden of Oklahoma State Penitentiary on February 28, 2013, is automatically substituted for Randall G. Workman as Respondent in this case.

Petitioner Benjamin Cole, an Oklahoma state prisoner convicted of one count of first degree murder of a child and sentenced to death, appeals from the district court's denial of his petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's denial of federal habeas relief.

## I

### *Factual background*

On the evening of December 20, 2002, Cole's nine-month-old daughter, Brianna Cole, began having trouble breathing. Cole "performed CPR and instructed his wife to call 911." Cole v. State, 164 P.3d 1089, 1095 (Okla. Crim. App. 2007) (Cole I). Rescue efforts failed, however, and Brianna died. A subsequent autopsy revealed that "Brianna's spine had been snapped in half, and her aorta had been completely torn through due to non-accidental stretching." Id. at 1092. "The official cause of death was described as a fracture of the spine with aortic laceration." Id. Cole "initially told authorities that on the night in question he went to calm his crying infant without any particular untoward incident occurring." Id. at 1095. But when he "was later confronted with the autopsy results and placed under arrest," id., Cole "admitted causing the fatal injuries," id. at 1092. "In a statement he gave to police, [Cole] said he'd been trying, unsuccessfully, to get the child, who was lying on her stomach, to stop crying." Id. Cole "eventually grabbed [Brianna] by the ankles and pushed her legs toward

2

her head until she flipped over." Id. "This action broke [her] back and resulted in [the] fatal injuries." Id. Cole "took no remedial action just after this incident happened." Id. Instead, "[h]e went and played video games, denied anything was wrong with [Brianna] when confronted by his wife, and said nothing to rescue or medical personnel about what had happened." Id.

*Cole's trial proceedings*

On December 26, 2002, Cole was charged by felony information in the District Court of Rogers County, Oklahoma, with one count of first degree murder of a child, in violation of Okla. Stat. tit. 21, § 701.7(c). On November 20, 2003, the State filed a bill of particulars alleging the existence of three aggravating circumstances: (1) Cole was previously convicted of a felony involving the use or threat of violence to the person;[1] (2) the murder was especially heinous, atrocious or cruel; and (3) the existence of a probability that Cole would commit criminal acts of violence that would constitute a continuing threat to society.

The case proceeded to trial in October 2004. At the conclusion of the first-stage evidence, the jury found Cole guilty of murder in the first degree. At the conclusion of the second-stage evidence, the jury found the existence of two of the three aggravating factors alleged in the bill of particulars — the murder was

---

[1] This alleged aggravator was based upon Cole's prior conviction for willful and unlawful infliction of cruel and inhuman corporal punishment of his then-six-month-old son, Benjamin Robert Cole, Jr.

3

especially heinous, atrocious or cruel, and that Cole had been previously convicted of a felony involving the use or threat of violence to the person — and fixed Cole's punishment at death.

On December 8, 2004, the state trial court, in accordance with the jury's second-stage verdict, sentenced Cole to death. Judgment in the case was entered that same day.

*Cole's direct appeal*

Cole filed a direct appeal with the OCCA asserting thirteen propositions of error. On July 11, 2007, the OCCA issued a published opinion affirming Cole's conviction and death sentence. Cole I, 164 P.3d at 1102.

*Cole's application for state post-conviction relief*

On February 28, 2007, prior to the resolution of his direct appeal, Cole filed an application for state post-conviction relief with the OCCA asserting five propositions of error. On January 24, 2008, the OCCA issued an unpublished opinion denying Cole's application. Cole v. State of Okla., No. PCD-2005-23 (Okla. Crim. App. Jan. 24, 2008) (Cole II).

*Cole's federal habeas proceedings*

Cole initiated these federal habeas proceedings on June 2, 2008, by filing motions for appointment of counsel and for leave to proceed in forma pauperis. Those motions were granted and, on May 15, 2009, Cole's appointed counsel filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The

4

petition asserted fourteen grounds for relief.

On September 1, 2011, the district court issued an opinion and order denying Cole's petition, but granting him a certificate of appealability (COA) with respect to five issues: an alleged breakdown in communications between Cole and his defense counsel; defense counsel's failure to investigate and present additional mitigating evidence; improper admission of photographs of the victim; sufficiency of the evidence to support the heinous, atrocious or cruel aggravator; and prosecutorial misconduct. Judgment in the case was entered that same day.

Cole filed a timely notice of appeal. This court subsequently expanded the COA to include the issue of cumulative error. Cole has since filed a motion to further expand the COA to include the issue of his competency to stand trial.

II

*Standard of review*

Because Cole's habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), both the district court and we are bound by AEDPA's standards of review. See Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007) (holding that AEPDA applies to § 2254 habeas petitions filed after its effective date).

Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id. If a claim was addressed on the merits by the state courts, our standard of review is governed by

5

28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"When reviewing a state court's application of federal law" under 28 U.S.C. § 2254(d), "we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks and citation omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. Because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if

6

any, for clear error.   <u>McLuckie</u>, 337 F.3d at 1197.

*Complete breakdown in communication between Cole and his attorneys*

In Proposition One of his appellate brief, Cole argues that he "was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution because there was a complete breakdown in communication between [himself] and his attorneys." Aplt. Br. at 15 (emphasis omitted).

*a) Facts pertaining to the claim*

On July 11, 2003, Cole's defense team, comprised of two attorneys from the Oklahoma Indigent Defense System (OIDS), filed an application for a competency evaluation of Cole.  State ROA, Vol. I at 55.  In that application, the defense team expressed "doubts as to [Cole]'s ability to understand the nature of the charges against him and meaningfully assist his attorneys in his defense."  <u>Id.</u> At a subsequent hearing on July 16, 2003, one of Cole's defense attorneys stated, in pertinent part, "it's one of those situations where I don't know necessarily if Mr. Cole doesn't like, or, for some reason, is resisting our conversations or advice, or if it's a situation where he doesn't understand."  Tr. of 7/16/03 Hr'g at 3.  The state trial court, at the conclusion of the hearing, ordered a competency evaluation of Cole.  <u>Id.</u> at 5.

On August 22, 2003, the state trial court conducted a post-competency evaluation hearing.  At the hearing, the defense team stipulated that the

7

psychologist who examined Cole had found him to be competent. Tr. of 8/22/03 Hr'g at 3. In turn, the defense team "stipulated as [Cole's] counsel" that he was "competen[t] at this time." Id. The state trial court then asked Cole, on the record, if he understood the charges against him and if he believed that he was able to consult with his counsel and rationally assist in the trial preparations. Cole answered "yes" to these questions. Id. at 4. Ultimately, Cole waived his right to a jury trial on the issue of competency and stipulated that he was competent.

Approximately eleven months later, on July 9, 2004, the defense team filed a second application for determination of competency. In the application, the defense team alleged, in pertinent part, that Cole's "mental state and communication abilities [we]re such that they seriously interfere[d] with his understanding of the proceedings against him and with his capability of aiding his attorney in preparation for trial," Cole's "responses to questions pertaining to his defense [we]re unrelated and unresponsive to what was asked, and appear[ed] to be based on unrealistic and irrational thoughts and ideas," and "[d]efense counsel's investigation in the . . . case ha[d] revealed that [Cole] ha[d] suffered from lifelong chronic alcoholism," "ha[d] a history of huffing gasoline as a child," and "ha[d] experienced physical head trauma resulting in loss of consciousness on more than one occasion during his lifetime." State ROA, Vol. II at 239. On July 15, 2004, the state trial court issued an order directing that

8

Cole be "examin[ed] by qualified persons and technicians . . . to reach a conclusion as to [his] competency." Id. at 245.

Cole was subsequently examined by Samina Christopher, a forensic psychologist employed at the Oklahoma Forensic Center, a state-run behavioral health facility.[2] In a written report submitted to the state trial court on August 18, 2004, Christopher concluded, in pertinent part, that Cole was "aware of the charge against him and the possible penalty if convicted," id. at 255, was able to consult with his attorney and rationally assist in the preparation of his defense, id. at 255-56, and was not a person requiring treatment as defined in Okla. Stat. tit. 43A, § 1-103, because he was "not currently report[ing] symptoms nor evidenc[ing] signs indicative of a substantial disorder of thought, mood, perception, psychological orientation, or memory," id. at 257. In short, Christopher concluded that Cole "[wa]s capable of rationally assisting his counsel in his defense, should he choose to do so." Id. at 259.

On August 25, 2004, Cole's defense team requested that a jury trial be held on the issue of Cole's competency. The state trial court granted that request and a jury trial on the issue of Cole's competency was held on September 13 and 14, 2004. During the trial, one of Cole's defense attorneys testified that Cole was not very engaged in trial preparation, was distant, and declined to make decisions

---

[2] Christopher had previously examined Cole in the summer of 2003.

9

relevant to the defense strategy. At the conclusion of the trial proceedings, however, the jury found that Cole was competent to undergo further criminal proceedings.

On September 29, 2004, Cole sent a letter to the central office of OIDS "in regards of firing [his appointed defense team] due [to] my Christian beliefs." Id. at 416. Cole's letter stated that he "need[ed] a team who has a better relationship with my Lord Jesus Christ." Id. Cole acknowledged "this [wa]s probably a hard thing," but he stated that he "really d[id] need a new team, that [he] c[ould] better work with." Id. After learning of this letter, Cole's defense team filed a motion for continuance. In support of the motion, one of Cole's defense attorneys submitted an affidavit alleging that Cole was unhappy with his defense team and was unwilling to cooperate with them.

On October 4, 2004, the state trial court held a hearing on the motion for continuance. After hearing briefly from Cole's attorneys, the state trial court dismissed them from the courtroom and questioned Cole under oath. Cole testified that he believed his appointed attorneys were religiously prejudiced against him. Tr. of 10/04/04 Hr'g at 13. In support, Cole testified that he believed that, during the competency trial, his attorneys "exaggerated to what [his] intention was," and were effectively ridiculing his faith. Id. at 14. Cole also testified that he and two of his attorneys "ha[d] a difficult time communicating." Id. at 18. Cole further testified that one of the OIDS investigators "mock[ed]

10

God in front of [Cole]." Id. at 20. Lastly, Cole testified that he knew his defense attorneys "[we]re good at what they do," id. at 21, but that he would nevertheless "like to have a team that [he] could confidently trust," id. at 20-21, and he "want[ed] it done in the Lord's sight for the right reasons," id. at 21. The state trial court ultimately found, however, that neither of Cole's appointed OIDS attorneys were prejudiced towards Cole's religious beliefs or had done anything that was "wrong." Id. at 23. The state trial court further found that both defense attorneys were simply trying "to be aggressive advocates on behalf of . . . Cole." Id. Consequently, the state trial court denied the motion for continuance and urged Cole to work with his appointed counsel "to give [them] the information that [they] need[ed] to represent and present a defense on his behalf." Id. at 23-24.

In an affidavit submitted in connection with his federal habeas petition, Cole's lead trial counsel, James Bowen, stated that Cole's "competency and ability to assist the team became even worse after the competency trial," and they "could not get him to be engaged in his case." Dist. Ct. Docket No. 16, Att. 10 at 1. Bowen further described Cole's conduct at trial:

> Every day of the murder trial, Mr. Cole would come into court, place his Bible on the table, sometimes opened, sometimes not, then sit down in his chair. It seemed like he stayed in the same position without moving during the proceedings. If the Bible was opened, he stared at the page upon which it was opened. It did not appear that he ever turned the page. I recall Mr. Burch [the prosecutor] stating that Mr. Cole never moved while I was addressing the Court or when

11

conducting examinations of witnesses. The only movement I recall Mr. Cole making was maybe blinking his eyes. Even when the verdict was returned, Mr. Cole did not move.

Id.

*b) The OCCA's ruling on the issue*

Cole first asserted this issue in Proposition Four of his direct appeal brief.

The OCCA rejected it, stating as follows:

> In proposition four, Appellant claims the trial court denied him the right to effective assistance of counsel after he developed a conflict with his trial counsel and requested to have them replaced. The denial of that request, Appellant argues, was a violation of the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, sections 7 and 20 of the Oklahoma Constitution.

> As Appellant's brief freely admits, by the time of trial Appellant "had withdrawn into extreme religiosity, made little if any effort to assist his attorneys or to prepare his defense while awaiting inspiration from God, and sat through the entire trial at counsel table literally not moving a muscle for hours on end while reading the Bible." The record shows Appellant sought to fire his attorneys less than a month before trial, due to "Religious Prejudices." Appellant requested a "Pentecostal team of lawyers" or "of the like". Apparently, due to his trial counsel's tactic of using his extreme religious beliefs to help demonstrate mental incompetence, Appellant believed his attorneys had "spit in the face of God." When questioned by the trial court concerning this issue, Appellant explained his belief that his attorneys had exaggerated his religious stance and therefore he refused to talk with them.

> The trial court refused to appoint new counsel, however, basing its decision on reasons that are fully supported by the record. We see no "complete breakdown in communication" of the type addressed in Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000) and United States v. Lott, 433 F.3d 718, 725–26 (10th Cir. 2006). Instead, this record suggests an uncooperative defendant who, religious differences aside, substantially and unreasonably contributed to the

12

communication breakdown. This proposition is without serious merit.

Cole I, 164 P.3d at 1093-94 (internal paragraph numbers omitted).

*c) Clearly established federal law applicable to the claim*

In challenging the OCCA's decision, Cole begins by identifying United States v. Cronic, 466 U.S. 648 (1984), Powell v. Alabama, 287 U.S. 45 (1932), Gideon v. Wainwright, 372 U.S. 335 (1963), and Strickland v. Washington, 466 U.S. 668 (1984), as the clearly established federal law applicable to this claim. While these cases frequently guide our analysis in the habeas context, with the assumed exception of Strickland, we decline to accept them as the "clearly established federal law" relevant to *this particular claim* within the meaning of 28 U.S.C. § 2254(d)(1). Our understanding of the Supreme Court's "articulation of what constitutes clearly established law is noticeably more restrictive" than Cole suggests. See House v. Hatch, 527 F.3d 1010, 1016–17 (10th Cir. 2008) (discouraging the practice of "draw[ing] clearly established federal law from general principles teased from precedent" and noting that "clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*").

At the outset, we note that Cole has not cited to any Supreme Court case, nor has our own independent research produced such a case, holding that a presumption of prejudice applies in situations where there has been a complete

13

breakdown in communications between a criminal defendant and defense counsel. Cole does rely on Cronic, where the Supreme Court held that prejudice may be presumed in certain extreme "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. The Supreme Court emphasized that "[a]n accused's right to be represented by counsel is a fundamental component of our criminal justice system." Id. at 653. And, the Court noted, "the core purpose of the counsel guarantee [i]s to assure 'Assistance' at trial, when the accused [i]s confronted with both the intricacies of the law and the advocacy of the public prosecutor." Id. at 654 (internal quotation marks omitted). "If no actual 'Assistance' 'for' the accused's 'defense' is provided," the Court held, "then the constitutional guarantee has been violated." Id.

We find Cronic inapposite for at least two reasons. First, although the Supreme Court acknowledged the possibility of presuming prejudice in Cronic, it did so in a factually distinguishable context that did not involve a breakdown in communications between a criminal defendant and defense counsel. See 466 U.S. at 649; see also House, 527 F.3d at 1016 (requiring "closely-related" facts). Defense counsel in Cronic was a relatively inexperienced real estate attorney who was appointed only twenty-five days before his client's mail-fraud trial. Cronic, 466 U.S. at 649. And, second, "the Supreme Court and this court have emphasized the narrow application of Cronic." Lockett v. Trammel, 711 F.3d

14

1218, 1248 (10th Cir. 2013); see Turrentine v. Mullin, 390 F.3d 1181, 1208 (10th Cir. 2004) (noting that "Cronic [is] inapplicable where counsel actively participated in all phases of the trial proceedings").

Moreover, to the extent that Cole asks us to accept as clearly established federal law *our* refinement of Cronic, as articulated in Romero and United States v. Hernandez, 849 F.2d 1325 (10th Cir. 1988), we decline to do so. See Marshall v. Rodgers, 133 S. Ct. 1446, 1450–51 (2013) ("[An] appellate panel . . . may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct."). We consequently "reject [his] alchemic efforts to transmute the holdings of these cases into clearly established federal law for this *particular factual context*." Littlejohn v. Trammell, 704 F.3d 817, 853 (10th Cir. 2013).

Because they too enunciate broad legal principles, Powell and Gideon likewise are not "clearly established federal law" within the meaning of 28 U.S.C. § 2254(d)(1). In Powell, the Supreme Court held

> that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case. To hold otherwise would be to ignore the fundamental postulate . . . that there are certain immutable

15

principles of justice which inhere in the very idea of free government which no member of the Union may disregard.

287 U.S. at 71-72 (internal quotation marks omitted). Similarly, in Gideon, the Supreme Court held that "in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." 372 U.S. at 344.

Cole does his best job of trying to identify clearly established federal law when he directs us to Strickland, because of the well-recognized, extensive breadth of Strickland's standard. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (recognizing limited circumstances in which general standards such as the Strickland test constitute clearly established law). Proceeding with an abundance of caution, we are prepared to assume without deciding that Strickland provides clearly established federal law for this claim. In Strickland, the Supreme Court held that "[r]epresentation of a criminal defendant entails certain basic duties." 466 U.S. at 688. In particular, the Court emphasized, "[f]rom counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Id.

*d) Cole's challenge to the OCCA's ruling*

Turning to the OCCA's decision, Cole argues that the OCCA's analysis of

16

his claim was "unreasonable for two reasons." Aplt. Br. at 23. First, Cole argues that "the OCCA's finding that there was no 'complete breakdown in communication' is unsupported by the record." Id. In fact, Cole asserts, "[t]he record demonstrates that the breakdown in communication began six months after counsel entered their appearance and continued all the way through trial." Id. Cole further asserts that it was unreasonable for the OCCA "to 'set aside' [his] irrational and delusional hyper-religiosity, since it [wa]s his delusional and irrational belief system that prevented [him] from rationally assisting counsel." Id. at 23-24. "The bottom line," Cole argues, is that he did not, "due to his delusional and irrational beliefs," provide the information necessary for counsel to defend him. Id. at 24.

Second, Cole asserts "it [wa]s unreasonable [for the OCCA] to find [he] was simply being uncooperative in light of the meaningful evidence . . . demonstrat[ing] [that he] was suffering from either a mental disease, disorder, or defect, and that this illness affected [his] ability to communicate with counsel." Id. at 24. In support, Cole points to testimony that was presented on his behalf during the competency jury trial, as well as affidavits from his defense counsel and defense team members that were submitted in connection with his federal habeas petition.[3]

---

[3] In Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011), the Supreme Court

(continued...)

We conclude, however, that Cole's arguments are insufficient to warrant federal habeas relief under the standards of review outlined in § 2254(d). Although the record on appeal indicates, and the OCCA conceded, that Cole and his defense team had difficulties communicating with each other during the course of the pretrial proceedings, the OCCA found that Cole was partly responsible for these communication difficulties and that, in the end, there was not a complete breakdown in communication such that Cole was denied his right to effective assistance of counsel. And, though Cole disagrees with the OCCA's finding that he was partly responsible for the communication difficulties, he fails to establish that this was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Indeed, the state court record, including the colloquy that occurred between the state trial court and Cole during the hearing on Cole's motion for a continuance, firmly supports the OCCA's finding.

More importantly, a review of the trial transcript indicates that, notwithstanding these purported communication difficulties, Cole's defense team vigorously defended him during both stages of trial. In particular, Cole's defense

[3](...continued)
held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Consequently, we limit our review to the evidence that was before the OCCA and do not consider the new evidence that was submitted by Cole in connection with his federal habeas petition.

team successfully persuaded the jury, during the second-stage proceedings, to reject one of the aggravators the State had alleged and to conclude that Cole did not present a continuing threat.

Relatedly, although Cole asserts that he was ultimately "forced to go to trial with attorneys with whom he could not discuss his case or legal strategies," Aplt. Br. at 28, he fails to identify precisely how, let alone establish that, he was prejudiced by these purported communication difficulties. For example, although the record indicates that Cole rejected a last-minute plea bargain offered by the prosecution, Cole does not suggest in his briefing, let alone support with any type of evidence, that the purported communication breakdown impacted his decision in that regard. Further, although Cole's habeas counsel suggested at oral argument that the purported communication difficulties may have impacted the defense team's investigation of mitigating evidence and its second-stage presentation, there is no factual basis in the record to support that suggestion.

We therefore conclude that Cole is not entitled to federal habeas relief on the basis of this claim.

*Ineffective assistance of trial counsel - second-stage proceedings*

In Proposition Two of his appellate brief, Cole contends that his trial counsel failed to investigate and present mitigation evidence from Cole's family members that would have "personalized" him to the jury. Consequently, Cole argues, he was deprived of his right to effective assistance of counsel in violation

19

of the United States Constitution.

*a) Facts pertaining to the claim*

During the second-stage proceedings, Cole's defense team presented testimony from five witnesses.[4] The first witness was Cole's stepbrother, Leonard O'Neil. O'Neil testified that when he was thirteen years old and Cole ten years old, his father married Cole's mother and that their blended family of seven began living together in California. According to O'Neil, the family lived in a house located on the grounds of a junkyard, and he and Cole would "huff" (i.e., get high from) gasoline from old cars found in the junkyard. O'Neil further testified that, shortly after they began living together, he and Cole began sneaking alcohol out of their father's refrigerator. According to O'Neil, a man named Tom Wright, who he described as his father's best friend, was frequently present in their home and, over a period of approximately twenty years, molested O'Neil and his siblings, including Cole.[5] O'Neil also testified that two of the other boys in the family were "slow" or mentally retarded. Lastly, O'Neil testified that even

---

[4] The defense team and the prosecution also stipulated as to the testimony of a sixth mitigation witness, Cindy Garcia. Specifically, the parties stipulated that Garcia would testify that (a) she was a pastor, (b) she met Cole in 1989, (c) Cole began to drink after he met and moved in with his ex-wife, Candy Lewis, (d) Cole was truly remorseful for what he had done to Brianna, and (e) Cole deserved mercy from the jury.

[5] On cross-examination, O'Neil conceded that he did not actually see Wright molest Cole, but he testified that he nevertheless believed that Wright had, in fact, molested Cole.

though he did not agree with Cole's actions, he still loved Cole and that Cole's life had value to him.

Cole's second mitigation witness was psychologist Jeanne Russell. Russell testified that she was hired by defense counsel to perform a risk assessment on Cole. According to Russell, Cole admitted to her that he had been sexually abused on one occasion, but that he tended to minimize the effect this incident had on him. Russell testified that, in her opinion, Cole did not exhibit any symptoms indicating that he was psychotic or out of touch with reality. Likewise, Russell testified that Cole scored fairly low on the psychopathy test she administered to him. In Russell's view, Cole had issues with the abuse of alcohol, and his risk for violence, especially domestic abuse, tended to occur in connection with his abuse of alcohol. Russell also testified that Cole was impulsive, had very poor coping skills, and had a personality disorder that caused him to focus on his own needs and, in turn, to fail to recognize the needs of others. Russell opined that Cole would not have any problems in a structured setting such as prison, but that his risk of engaging in violence would increase if he were released into the community. Without access to alcohol, Russell testified, Cole tended to retreat into and obtain comfort from his religious beliefs. Consequently, she testified, Cole's behavior during the first-stage proceedings did not surprise her. Russell concluded her testimony by opining that Cole would likely be viewed by other prisoners as a weak person and would thus likely be

21

preyed upon in a prison situation.

Cole's third mitigation witness was Michael Basso, an associate professor of psychology at the University of Tulsa. Basso testified that he was hired by defense counsel to evaluate Cole and to prepare a report outlining his findings. According to Basso, Cole may have suffered two types of brain damage. First, Basso testified, Cole reported that in 1985, while arguing with an acquaintance, he was struck over his right forehead with a hammer and lost consciousness for some period of time. In Basso's view, this incident posed a possible risk of brain damage to Cole. Second, and more significantly, Basso testified that Cole's longstanding history of excessive alcohol use posed a significant threat of brain damage. Basso explained that brain damage resulting from alcohol use leads to a deterioration in function that is often expressed in terms of "slowing people." Trial Tr., Vol. VIII at 67. For example, Basso testified, it would take a person longer to think things through, would negatively impact their memory, and would reduce their ability to pay attention and concentrate. Basso also testified that it would negatively impact concept formation, abstract reasoning, and problem solving. All of this, Basso testified, could have negatively impacted Cole's impulsivity. With respect to Cole specifically, Basso testified, his testing indicated that Cole had mild brain dysfunction, meaning that his brain did not function normally compared to other people his age.

The fourth mitigation witness to testify was Bill Sharp, a licensed

22

psychologist hired by defense counsel to evaluate Cole. Based upon his testing of Cole, Sharp diagnosed Cole as having a "personality disorder otherwise not specified." Id. at 110. According to Sharp, this diagnosis is usually reserved for situations when an individual has traits from more than one personality disorder and those traits are of such a nature that they have been long-term and chronic. In Cole's case, Sharp testified, these traits included narcissism and some paranoia or suspiciousness. Sharp further diagnosed Cole as having intermittent explosive disorder. Sharp described this diagnosis as encompassing situations "where there's a repetition of discrete reoccurrences of a pattern where an individual fails to inhibit aggressiveness towards people or property to the extent that it winds up that there's either damage to the property or to the person." Id. at 114. In other words, Sharp testified, it involves "a reaction that is way off the scale of normalcy." Id. at 115. According to Sharp, alcohol abuse can "inflame" both an intermittent explosive disorder and a personality disorder. Id. at 116. Sharp explained that alcohol "disinhibits" a person, and when a person does not have much impulse control to begin with, they have even less when they are consuming alcohol. Id. Lastly, Sharp opined that Cole was likely an alcoholic.

The fifth and final mitigation witness was Jolynn Elkin-Hohenstein (Elkin), a detention officer employed by the Rogers County (Oklahoma) Sheriff's Office. Elkin testified that Cole had been an inmate at the Rogers County Jail for nearly two years and that, during that time, she had become acquainted with him while

23

transporting him back and forth for court proceedings. She further testified that Cole seemed to interact well with the other people in his housing unit, was quiet, had not received any write-ups, and had never done anything violent while in the Rogers County Jail. Elkin opined that Cole was not a "problem inmate." Id. at 133.

Notwithstanding the presentation of this evidence, Cole now suggests that "[m]ajor elements of available mitigation, which would have saved [his] life and assisted his experts in evaluating him and explaining his actions were omitted due to trial counsel's incomplete investigation and utter failure to effectively present what was known." Aplt. Br. at 31. In support, Cole alleges that "the OIDS investigator assigned to [his] capital trial," Steve Leedy, "did not 'conduct personal interviews or make appeals to' [Cole's brother] Darren Cole, Darren's wife Tammy, and Robert Cole [another of Cole's brothers] due to: (1) Tammy being 'less than helpful' on the phone; (2) Robert stating that . . . Cole should get death; and (3) the fact that he was not able to speak to Darren." Id. at 32 (quoting ROA, Vol. 1, Part 1, Doc. 16, Attach. 21, ¶¶ 1-2; footnote omitted). Had his trial counsel or Leedy actually interviewed these family members, Cole asserts, they would have obtained and could have presented to the jury evidence establishing that:

> 1) "Cole grew up in a family that suffered from extreme alcohol and substance abuse problems." Id. at 41. This would have included evidence that "[c]hildren in the Cole family . . . were given drugs and

24

alcohol whenever they wanted it, including Cole at the . . . age of six," and that "oftentimes Cole and his siblings would drink and do drugs with their parents," id.;

2) "[R]ampant incest, sexual abuse, and inappropriate relationships . . . occurred throughout the Cole family." Id. at 42. This would have included evidence that "Cole's biological father . . . sexually abused children in the family," that "Cole's cousins had sexual relationships with each other," "Cole's stepmother prior to marrying Cole's biological father was married to Cole's father's nephew," "Cole's aunt had sexual relations with her son-in-law," "at the age of fourteen, Cole had a sexual relationship with his thirteen year-old stepsister," and "Cole's first wife was his first cousin." Id.;

3) "[G]enetic factors were present that increased the likelihood that Cole would have a mental illness." Id. This would have included evidence "that two of Cole's brothers were mentally retarded and . . . received social security benefits," id., and "at least four of [Cole's] paternal cousins have been diagnosed with paranoid schizophrenia," id. at 42-43.;

4) "Cole's paranoid schizophrenia with persecutory and grandiose delusions affected his behavior/appearance at trial."[6] Id. at 43.;

5) Cole has "damage to the left frontal-temporal region of Cole's brain" that, through no choice of his own, affects his behavior in terms of reducing his impulse control and making him more likely to act violently, id. at 43-45; and

6) Cole's first child, Benjamin Robert Cole, Jr., who as an infant was the victim of Cole's prior felony conviction for willful and unlawful infliction

---

[6] On April 4, 2009, Raphael Morris, a clinical assistant professor of psychiatry at New York University School of Medicine, issued a report concluding that Cole has "schizophrenia, paranoid type, with grandiose delusions, which have manifested as [his] hyper-religiosity," and that, as a result, "his inability to assist is not under his control and his behavior towards his legal team is not based on rational thought." ROA, Vol. 1, Part 1, Doc. 16, Attachment 5 at 2. Notably, Cole did not mention or otherwise rely on Morris's report in his application for state post-conviction relief.

of cruel and inhuman corporal punishment, "ha[d] no long term injuries from the actions his father inflicted on him," and "he expressed forgiveness for his father and a desire to have a relationship with [Cole]." App. for State Post-Conviction Relief at 25.

Cole in turn argues that, had this information been presented on his behalf during the second-stage proceedings, the outcome of those proceedings likely would have been different. More specifically, Cole argues, based upon the above-described evidence, that he "had a strong and compelling case in mitigation in the form of the abuse and trauma he suffered as a child, his mental illness, and his brain damage," and "[t]his is precisely the type of evidence where there exists a reasonable probability that at least one jury [sic] could have been moved by it and voted for a sentence less than death."[7] Aplt. Br. at 45.

*b) The OCCA's ruling on the issue*

Cole first asserted this issue in Proposition Two of his application for state post-conviction relief. The OCCA rejected it, stating as follows:

> In proposition two, Petitioner claims trial counsel's failure to present compelling mitigation evidence in the second stage of trial rendered their performance deficient. This claim also could have been raised on direct appeal, but it was not. Therefore it is waived. And to the extent that it was not waived (by appellate counsel's alleged ineffective assistance in failing to raise the claim in the direct appeal), we find it is without merit.

---

[7] In his application for state post-conviction relief, Cole argued that this additional information would have caused his expert witness, Dr. Bill Sharp, to alter his diagnosis from Alcohol Abuse to Alcohol Dependence. Application for State Post-Conviction Relief at 26. But Cole does not make this specific argument in his appellate brief in this case.

This case is unlike, say, <u>Garrison v. State</u>, 2004 OK CR 35, ¶ 150, ¶ 169, 103 P.3d 590, where we found the defendant's trial counsel "failed to provide a significant case in mitigation during the second stage of . . . trial" and that his appellate counsel had been ineffective for failing to raise the obvious claim on appeal. Here, a constitutionally adequate amount of mitigation evidence was offered and admitted through various expert and lay witnesses, including one family member. We layed [sic] out that evidence throughout our Opinion in Petitioner's direct appeal, including a detailed listing in our mandatory sentence review of his capital conviction. <u>See Cole v. State</u>, 2007 OK CR 27, ¶ 63, 164 P.3d 1089.

Furthermore, the affidavits attached to Petitioner's post-conviction application do not provide convincing support for a claim of ineffective assistance in trial counsel's interview of Petitioner's family. Rather than dropping the ball on the issue by not interviewing some family members face-to-face, counsel instead made reasonable strategic choices when, upon contacting certain family members by phone, their investigator was confronted by less than sympathetic responses. The fact that Petitioner's first son was not contacted was understandable because counsel had fought hard to keep out Petitioner's abuse of that son from being admitted into evidence. It was a reasonable decision to not present that testimony to the jury, as any focus on the earlier abuse was arguably unhelpful to Petitioner's case.

We therefore find this proposition is without merit.

<u>Cole II</u>, No. PCD-2005-23 at 5-6.

*c) Procedural bar*

Respondent argues that Cole's claim is procedurally barred because the OCCA held that the claim could have been, but was not, raised on direct appeal and was thus waived for purposes of state post-conviction review. Aplee. Br. at 24. Although respondent concedes that the OCCA proceeded to review the claim on the merits, respondent asserts that the OCCA did so only because Cole, "[i]n

27

an effort to avoid waiver, . . .also raised [a claim of ] ineffective assistance of appellate counsel." Id. Consequently, respondent asserts, the OCCA had to "review[] the substantive claim" on the merits "in order to evaluate [Cole's] appellate counsel claim." Id. Nevertheless, respondent argues, the OCCA's ultimate holding was that the ineffective assistance of trial counsel claim was waived. Therefore, respondent asserts, we must treat the claim as procedurally barred for purposes of federal habeas review.[8]

Respondent's arguments are supported by Tenth Circuit precedent and the record in this case. In Thacker v. Workman, 678 F.3d 820 (10th Cir. 2012), a recent federal habeas proceeding brought by an Oklahoma capital defendant, we held, under similar circumstances, that we had to "acknowledge and apply the OCCA's procedural bar ruling, even though the OCCA, on an alternative basis, briefly addressed and rejected the merits of [the habeas petitioner's] claim." Id. at 834 n.5. In this case, as respondent correctly notes, the OCCA's primary basis for rejecting Cole's ineffective assistance claim was that it had been waived. In turn, the OCCA's sole reason for addressing the claim on the merits was to

---

[8] In his appellate brief, Cole argues that we should not consider respondent's procedural bar argument because "[r]espondent readily admitted in district court that 'the [OCCA] addressed this claim on the merits by and through the evaluation of trial counsel's actions and the non-record evidence produced in Petitioner's post-conviction affidavits.'" Aplt. Br. at 46 (quoting Doc. 23 at 62). But a careful review of the response filed by respondent in the district court indicates that respondent clearly argued that Cole's claim of ineffective assistance was procedurally barred. Doc. 23 at 52.

address and reject Cole's ineffective assistance of appellate counsel claim. Thus, as in Thacker, we must acknowledge and apply the OCCA's procedural bar ruling.

Before treating Cole's ineffective assistance claim as procedurally barred for purposes of federal habeas review, however, we must determine whether the OCCA's procedural bar ruling was both independent and adequate. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court held that "federal habeas review . . . is barred" in any case "in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule[,] . . . unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id. at 750. In other words, "[i]f a particular claim was defaulted in state court on an independent and adequate state procedural ground, we recognize the state courts' procedural bar ruling and do not address the claim on the merits unless cause and prejudice or a fundamental miscarriage of justice is shown." Thacker, 678 F.3d at 835 (internal quotation marks omitted). "To be independent, the procedural ground must be based solely on state law." Id. "To be adequate, the procedural ground must be strictly or regularly followed and applied evenhandedly to all similar claims." Id. (internal quotation marks omitted).

It is beyond dispute that the procedural bar rule applied by the OCCA in

29

Cole's case was based upon Oklahoma state law and thus is considered "independent" for purposes of federal habeas review. Therefore, that leaves only the question of adequacy. We have held that "[t]he Oklahoma requirement that a claim of ineffective assistance of trial counsel be raised on direct appeal is an adequate ground for procedural default if (1) the defendant's counsel on direct appeal [wa]s different from trial counsel and (2) the claim[] c[ould have] be[en] resolved on the trial record alone." Welch v. Workman, 639 F.3d 980, 1012 (10th Cir. 2011). In this case, it is undisputed that Cole was represented on direct appeal by private counsel, rather than the two OIDS attorneys who represented him at trial. And, although Cole's claim of ineffective assistance could not be resolved on the trial record alone since it relied on evidence that was never presented at trial, respondent argues that OCCA Rule 3.11 would have allowed Cole on direct appeal to request an evidentiary hearing on his claim, and that such a hearing would have allowed Cole to effectively supplement the record on appeal with the additional evidence relevant to his claim. Moreover, respondent correctly notes that Cole "does not make any argument that Rule 3.11 is [in]adequate or that he could not supplement the record to the state court." Aplee. Br. at 27. "[B]ecause [Cole] did not challenge the method by which he could supplement the facts on appeal to the State . . . , any argument that he was not provided an adequate procedure is waived." Welch, 639 F.3d at 1014.

We therefore conclude that Cole's claim of ineffective assistance of trial

30

counsel is procedurally barred for purposes of federal habeas review.

*d) Clearly established federal law applicable to the claim*

Out of an abundance of caution, we shall proceed to review the merits of Cole's ineffective assistance claim. In identifying the clearly established federal law applicable to his challenge to the OCCA's determination, Cole begins by acknowledging that "[t]he two prong test of Strickland requires [him] to establish [that] counsel's performance at the sentencing stage was deficient and [that] he suffered prejudice." Aplt. Br. at 30. In terms of investigating and presenting mitigating evidence, "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," nor does it "require defense counsel to present mitigating evidence at sentencing in every case." Wiggins v. Smith, 539 U.S. 510, 533 (2003). Further, the Supreme Court in Strickland emphasized that the deference to be granted a strategic judgment by counsel is directly related to the adequacy of counsel's investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

31

466 U.S. at 690-91.

In addition to the principles outlined in <u>Strickland</u>, Cole argues that, under <u>Wiggins</u>, 539 U.S. at 524, we must look to the ABA Guidelines in order to determine the professional standards applicable to defense counsel in capital cases. <u>Id.</u> That argument is supported by our recent decision in <u>Littlejohn</u>, where we noted that "[i]n capital cases, we refer to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases . . . in assessing" the prevailing "professional norms." 704 F.3d at 859 (internal quotation marks omitted). Under those Guidelines, "the topics defense counsel [generally] should investigate and consider presenting include medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences." <u>Id.</u> (emphasis and internal quotation marks omitted).

Finally, Cole cites to a number of other Supreme Court cases, but does not provide pinpoint citations for most of these cases and otherwise does not explain their relevance. And a review of those cited cases indicates that they are, at best, only marginally relevant to the ineffective assistance claim he is now asserting. <u>See</u> <u>Eddings v. Oklahoma</u> 455 U.S. 104, 112 (1982) ("the sentencer in capital cases must be permitted to consider any relevant mitigating factor"); <u>id.</u> at 115 ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation."); <u>Lockett v. Ohio</u>, 438 U.S. 586, 607

32

(1978) (noting general principle that sentencer in capital case must be allowed to consider as mitigating factors any aspect of the defendant's character and record or any circumstances of the offense); Woodson v. North Carolina, 428 U.S. 280, 304 (1976) ("we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."); Gregg v. Georgia, 428 U.S. 153, 206 (1976) (approving of a Georgia capital sentencing procedure that "focus[ed] the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant").

*e) Cole's challenge to the OCCA's ruling on the merits*

Cole argues that the OCCA's analysis of his ineffective assistance of trial counsel claim was unreasonable in two respects. First, Cole argues that, contrary to the conclusion reached by the OCCA, his "trial counsel's decision not to contact [his] entire family cannot be deemed strategic because counsel had no way of knowing what information other family [members] had." Aplt. Br. at 47. And, Cole argues, "counsel's excuse not to find and contact the rest of the Cole family because two members were unsympathetic is nonsensical." Id. Second, Cole argues that "the OCCA was unreasonable in finding that counsel's actions were reasonable not to present testimony from [his] first son as 'any focus on the

33

earlier abuse was arguably unhelpful to [him].'" Id. at 47-48 (quoting Cole II,

PCD-2005-23, at *6). According to Cole, "once the trial court allowed . . .

evidence [of Cole's abuse of his first son] to come in, [Cole's trial] counsel had a

duty to respond" to that evidence. Id. at 48. Cole argues that "[h]ad counsel

done the [c]onstitutionally required investigation: (1) counsel would have learned

that Cole's son had no hostile feelings towards his father and would like the

opportunity to visit, correspond, and get to know him; and (2) the damage to the

left frontal-temporal region of Cole's brain resulted in Cole's inappropriate

response to his first son's need for assistance." Id.

Addressing these arguments in order, we agree with Cole that the

unsympathetic attitudes displayed by two of his brothers, when contacted by

Cole's investigator, did not provide Cole's investigator or his trial counsel with a

rational basis for failing to contact other members of Cole's family. Because

"family and social history" is one of the crucial areas of investigation emphasized

in the ABA Guidelines, we will therefore assume that Cole can satisfy

Strickland's first prong, i.e., that his trial counsel's failure to contact other

members of Cole's family was constitutionally deficient.

The focus then turns to Strickland's second prong, i.e., whether counsel's

deficient performance so prejudiced Cole's second-stage defense that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of

34

the second-stage proceedings would have been different.[9]  <u>Strickland</u>, 466 U.S. at

694.  On this point, however, Cole clearly cannot prevail.  To begin with, Cole's

trial counsel attempted during the second-stage proceedings to give the jury a

glimpse into Cole's family and social history by presenting testimony from Cole's

stepbrother.  As noted, that testimony focused on some of the key difficulties that

Cole faced during his childhood: living in a blended family on the grounds of a

junkyard; an early introduction into substance (gasoline) and alcohol use; and the

molestation of Cole and his siblings by a family friend.  To be sure, Cole now

points to a variety of additional background evidence that could have been

presented.  But none of that evidence could have altered the jury's findings that

the murder was especially heinous, atrocious or cruel, or that Cole had been

previously convicted of a felony involving the use or threat of violence to the

person.  Nor, more importantly, is it probable that this additional background

evidence would have altered the jury's balancing of the aggravating and

mitigating factors or its ultimate sentencing decision.  More specifically, it is not

---

[9] The district court chose to proceed directly to <u>Strickland</u>'s second prong and applied AEDPA's deferential standard of review.  <u>See</u> <u>Cole v. Workman</u>, No. 08-CV-0328-CVE-PJC, 2011 WL 3862143, at *30 (N.D. Okla. Sept. 1, 2011). However, <u>Hooks v. Workman</u>, 689 F.3d 1148 (10th Cir. 2012), counsels that the portion of the <u>Strickland</u> test the district court never addressed should be reviewed de novo, and this is the standard we apply.  <u>See</u> <u>id.</u> at 1163–64 ("For federal habeas claims not adjudicated on the merits . . . , we exercise our independent judgment and review the federal district court's conclusions of law de novo." (internal quotation marks omitted)).

35

probable that additional evidence regarding the difficulties that Cole faced during his childhood could have reasonably persuaded the jury, given the horrific nature of Brianna's injuries and Cole's initial, relatively callous response to those injuries, that the mitigating factors outweighed the aggravating factors or that Cole deserved a sentence other than death.

As noted, Cole also points to additional expert testimony that he contends should have been presented that would have established that he suffers from paranoid schizophrenia. The problem for Cole, however, is that he cannot establish that his defense counsel performed deficiently in failing to obtain this evidence prior to trial. Indeed, a review of the state court records indicates that Cole's defense counsel vigorously attempted to establish that Cole was incompetent and, in doing so, obtained professional opinions from several expert witnesses (and in turn presented some of those opinions to the jury during the second-stage proceedings). None of those experts concluded that Cole suffered from paranoid schizophrenia. Although Cole has, since the time of his trial, been diagnosed by a psychiatrist as having paranoid schizophrenia, Cole has not alleged, let alone established, that his trial counsel was deficient in failing to secure an expert witness for trial who would have offered a similar opinion. In short, Cole cannot satisfy the first Strickland prong with respect to this evidence.

Lastly, Cole complains that his trial counsel failed to obtain and present testimony from Cole's first child, Benjamin Robert Cole, Jr. (Cole Jr.). In

36

resolving this challenge, we elect to proceed directly to the second prong of

Strickland. That is, we focus on the question of whether trial counsel's failure to

present testimony from Cole Jr. during the second-stage proceedings was

prejudicial. See Gilson v. Sirmons, 520 F.3d 1196, 1248 (10th Cir. 2008)

(proceeding directly to second prong of Strickland test). According to the record,

had Cole's trial counsel interviewed Cole Jr., they would have learned that Cole

Jr. (a) did not suffer any long-term injuries from Cole's abuse, (b) did not harbor

ill will towards Cole, and (c) was interested in developing a relationship with

Cole. We are not persuaded, however, that there is a reasonable probability that

the outcome of the second-stage proceedings would have been different had Cole

Jr. testified on Cole's behalf. To begin with, had Cole Jr. been presented as a

defense witness during the second-stage proceedings, the prosecution undoubtedly

would have questioned him regarding the serious injuries that Cole inflicted upon

him when he was six months old. Those injuries included: a broken ankle; a

cigarette burn to his left lower eyelid; bruises on the crown of his head, his

forehead, his torso, and his arms; a swollen and bruised penis; and a large, deep

red bruise mark across the back of his neck. Thus, Cole Jr.'s testimony may well

have reinforced the jury's decision to sentence Cole to death, rather than

persuading it otherwise. In any event, as with the other familial evidence cited by

Cole, the testimony from Cole Jr. would not, and indeed could not, have altered

the jury's findings regarding the two aggravating circumstances. Ultimately, we

37

cannot say that there is a reasonable probability that Cole Jr.'s testimony would have altered either the jury's finding that the aggravating factors outweighed the mitigating factors or its determination that Cole deserved a sentence of death.

For these reasons, we conclude that Cole was not prejudiced by his trial counsel's failure to investigate and present the various items of mitigating evidence that Cole now identifies.

*Admission of autopsy photographs*

In Proposition Three of his appellate brief, Cole argues that he was denied his constitutional rights to due process, a fundamentally fair trial, and a reliable sentencing hearing as a result of the state trial court's erroneous admission of "gruesome autopsy photographs" during the first-stage proceedings. Aplt. Br. at iv. According to Cole, "the prejudicial effect of this evidence was not limited to the jury's guilt determination" because "[t]he State incorporated all of the guilt stage evidence into the second stage." Id.

*a) Facts pertaining to the claim*

As Cole notes in his opening brief, "[t]hree of the photographs [at issue] were full-on autopsy photos depicting internal injuries and removed organs," and "[t]he medical examiner had to explain what exactly the pictures entailed." Id. at 55. State's Exhibit 7 "depicted the victim's broken spine and a separation between the third and fourth thoracic vertebrae where the spine was 'opened up.'" Id. (quoting Trial Tr., Vol VII at 17). State's Exhibit 8 "was a close up view

38

'with the organs removed but the aorta remaining in place and the spinal fracture remaining in place.'" Id. (quoting Trial Tr., Vol. VII at 19). State's Exhibit 9 "was a picture of the removed 'abdominal block of organs,' in other words, the medical examiner had removed, as a unit, then photographed the victim's 'stomach and gastrointestinal tract and so forth.'" Id. (quoting Trial Tr., Vol. VII at 18). "Lastly, State['s] Ex[hibit] 6 . . . depicted [the victim's] face and chest while laying on the autopsy table, but prior to the actual autopsy." Id. When the trial court admitted Exhibit 6, it stated on the record, referring to the victim, "I think people need to know who she is and this at least gives somebody an opportunity to see a picture of her." Trial Tr., Vol. VI at 47.

*b) The OCCA's ruling on the issue*

Cole raised a similar issue on direct appeal in Proposition Three of his direct appeal brief. Specifically, Cole argued in Proposition Three of his direct appeal brief that the trial court improperly admitted the three photographs of Brianna that were taken during or after the autopsy. Although Cole referred to the pre-autopsy photograph (Exhibit 6) and contrasted it with the remaining three photographs, he did not expressly challenge its admission.

The OCCA rejected Cole's arguments, stating as follows:

> In proposition three, Appellant claims the admission of three gruesome autopsy photographs at trial deprived him of his Constitutional right to a fundamentally fair trial pursuant to the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7 and 9 of Oklahoma's Constitution. These

39

three autopsy photos were admitted over defense objections that they were unfairly prejudicial, cumulative, and depictions of the medical examiner's handiwork—and in spite of the trial court's own concerns that they are gruesome. Additionally, another photo was admitted of the deceased child as she lay on the autopsy table, but before any procedures were performed.

The State, on the other hand, claims the photographs were corroborative, rather than cumulative, to the medical examiner's testimony. The State also sets forth the general rule that admission of evidence lies within the sound discretion of the trial court "whose rulings will not be disturbed unless that discretion is clearly abused, resulting in manifest prejudice to the accused." Davis v. State, 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79.

The issue of gruesome photographs has been discussed by this Court in case after case, and the issues relating thereto are well known. As we have said before, "Gruesome crimes result in gruesome pictures." Patton v. State, 1998 OK CR 66, ¶ 60, 973 P.2d 270, 290. On the other hand, post-autopsy photographs have often been found to be inadmissible by this Court on the basis that their probative value was substantially outweighed by prejudicial effect due to their shocking nature and tendency to focus on the handiwork of the medical examiner, rather than the defendant. See, e.g., Wilson v. State, 1998 OK CR 73, ¶ 92, 983 P.2d 448, 468; Sattayarak v. State, 1994 OK CR 64, ¶ 8, 887 P.2d 1326, 1330; Oxendine v. State, 1958 OK CR 104, ¶¶ 6–8, 335 P.2d 940, 942–43.

Here, the photos at issue fall squarely on the line between what is relevant and what is prejudicial. The photos at issue are extremely grotesque, the sort of pictures that we would all like to avoid in our lives. However, this was an extremely brutal crime, one that can fairly be described as a grown man breaking a helpless child in half. The nature of those injuries, unlike most first degree murders, was hidden inside the child's body. Indeed, medical personnel attempting to rescue the child's life were unaware of the precise nature of the injury until an autopsy was performed.

The photos did not show crude Frankenstein stitching, but instead focused on close up shots of the victim's wounds, i.e., the broken spine and separated aorta, after the medical examiner had done what

was necessary in order to reveal them. We think two of these shots, rather than three, would have sufficed, given the fact that Appellant admitted being the cause. One photo (State's Exhibit 7) focused on the injury to the spine while another (State's Exhibit 9) focused on the aorta. State's Exhibit 8 was fairly redundant as to the injuries and gruesomeness. But we also note that these three shots were clearly preferable to others that were curiously proffered by the State, but denied admission by the Court.

Still, the State had to prove a willful or malicious use of unreasonable force by the defendant, and therefore it was important for the jury to consider fully the force applied by Appellant's actions. When speaking of malice and unreasonableness, pictures are worth much more than words. We find, therefore, the trial judge did not abuse his discretion in admitting two of these photos in the first stage.FN8 Moreover, we find a lack of first stage prejudice regarding the admission of the other photo, given Appellant's admissions of responsibility. We withhold judgment, however, regarding what inflammatory impact this additional photo may have had on sentencing until our review of proposition twelve, cumulative error, and later in our mandatory sentence review.

> FN8. The fourth photo, a picture of Brianna's face and upper torso after she had died but before the autopsy began had no particular relevance and should not have been admitted. But at the same time, the photo was not really prejudicial either, and we decline to grant any relief with respect to it.

Cole I, 164 P.3d at 1096-1097 (internal paragraph numbers omitted).

In the "Mandatory Sentence Review" section of its opinion, the OCCA effectively concluded that the improper admission of State's Exhibit 8 did not prejudice Cole: "Upon review of the record and after carefully weighing the aggravating circumstance and the mitigating evidence, along with the errors alleged in this appeal, we find the sentence of death to be factually substantiated

41

and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor." Id. at 1101.

*c) Clearly established federal law applicable to the claim*

Cole points to Romano v. Oklahoma, 512 U.S. 1 (1994), as providing the clearly established federal law applicable to this claim.[10] Aplt. Br. at 58. In Romano, the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment . . . applies to the sentencing phase of capital trials." 512 U.S. at 12. In turn, the Court held, when a defendant claims that the introduction of evidence during the penalty phase of a capital trial violates the Due Process Clause, "[t]he relevant question . . . is whether the admission of [the challenged] evidence . . . so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." Id.

*d) Cole's challenge to the OCCA's ruling*

In challenging the OCCA's ruling, Cole does not explain precisely why, in his view, the OCCA was wrong in concluding that two of the three autopsy photographs (i.e., State Exhibits 7 and 9) were properly admitted. Although Cole acknowledges that the OCCA concluded these two photographs were "'highly probative to show both cause of death and the conscious physical suffering

---

[10] Cole also points to a number of Tenth Circuit cases. Aplt. Br. at 58. But, as we have noted, none of those cases are applicable in determining whether the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)(1).

42

required by the especially heinous, atrocious, or cruel aggravator,'" Aplt. Br. at 56 (quoting Cole I, 164 P.3d at 1099 n.9), he makes no attempt to explain how that conclusion was contrary to, or an unreasonable application of, the constitutional principles outlined in Romano.

In any event, we conclude, after carefully examining the record on appeal, that the OCCA's ruling on these two exhibits was entirely consistent with Romano. The two photographs were relevant in the first-stage proceedings for purposes of aiding the jury in understanding the medical examiner's testimony regarding the injuries suffered by Brianna (which, as the OCCA correctly noted, were not visible to the naked eye) and the cause of her death. The photographs were in turn probative during the second-stage proceedings to establish that Brianna, prior to her death, likely endured conscious physical suffering as a result of the injuries inflicted by Cole. That finding was relevant to the jury's finding that the crime was especially heinous, atrocious, or cruel.

As for the third autopsy photograph, State's Exhibit 8, Cole acknowledges that the OCCA concluded it was redundant and thus improperly admitted. Cole I, 164 P.3d at 1097 ("We think two of these shots, rather than three, would have sufficed, given that Appellant admitted being the cause."; "State's Exhibit 8 was fairly redundant as to the injuries and gruesomeness."). Cole takes issue, however, with the OCCA's ultimate conclusion that the improper admission of this photograph did not deprive him of a fair sentencing proceeding. In

43

particular, Cole also asserts that the OCCA's "analysis [of Exhibit 8] is at odds with itself; given [that] the [OCCA] termed Exhibit 8 as *potentially* prejudicial then a few sentences later held the trial's errors could not have *conceivably* impacted the sentencing decision." Aplt. Br. at 57 (emphasis in original).

Again, however, we conclude that the OCCA's analysis was neither contrary to, nor an unreasonable application of, <u>Romano</u>. Because Exhibit 8 was simply duplicative of the two exhibits the OCCA concluded were properly admitted, its admission did not "so infect[] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." <u>Romano</u>, 512 U.S. at 12.

As a final matter, Cole argues that the OCCA was wrong in concluding that the introduction of State's Exhibit 6, the pre-autopsy photo, was not prejudicial. In support, Cole argues that this photo "appeared to depict an infant peacefully sleeping" and thus "was extremely damaging when considered in comparison to the other pictures." Aplt. Br. at 55. We note that this argument, however, is in direct contrast to the argument Cole asserted on direct appeal. In his direct appeal brief, Cole argued that it was the autopsy photographs, i.e., Exhibits 7, 8 and 9, when contrasted with Exhibit 6, that "acted to inflame the passions of the jury to [his] unending detriment."[11] Direct Appeal Br. at 46. In any event, we

_____

[11] Cole's direct appeal brief thus mentioned, but did not otherwise directly

(continued...)

44

conclude that the OCCA's assessment of the prejudicial impact of Exhibit 6 was neither contrary to, nor an unreasonable application of, clearly established federal law. Indeed, we readily agree with the OCCA that the admission of Exhibit 6 did not deprive Cole of a fair sentencing proceeding.

*Sufficiency of evidence - heinous, atrocious or cruel aggravator*

In Proposition Four of his appellate brief, Cole argues that his rights under the Eighth and Fourteenth Amendments were violated because the evidence presented during the second-stage proceedings was insufficient to allow the jury to reasonably find that the murder was especially heinous, atrocious or cruel.

*a) The OCCA's ruling on the issue*

Cole first raised this issue in Proposition Six of his direct appeal brief.[12] In support, Cole argued that "[t]he medical examiner's findings, *at most*, indicate[d] the *possibility* that some pain might have been felt by Brianna as the result of the fracture of the spine, but there [wa]s no evidence that Brianna was *conscious* during the time the injury was inflicted; and even if she was, [the medical

---

[11](...continued)
challenge, the admission of Exhibit 6. The OCCA, of its own accord, commented on the admissibility of Exhibit 6 in a footnote to its discussion of the admissibility of Exhibits 7, 8 and 9. Cole I, 164 P.3d at 1097 n.8. In light of the OCCA's sua sponte ruling regarding the admissibility of Exhibit 6, we will not treat Cole's challenge to the admissibility of Exhibit 6 as procedurally barred.

[12] As part of Proposition Six of his direct appeal brief, Cole also challenged the jury instruction on this aggravator and asserted that the aggravator was unconstitutionally vague and overbroad. Neither of those issues are before on in this appeal.

45

examiner] testified that such consciousness would not have lasted any more than thirty . . . seconds." Direct Appeal Br. at 64 (emphasis in original). Cole further argued that "[t]he logical inference" from his own statements to authorities that Brianna stopped crying immediately after he flipped her over "[wa]s that the injury was inflicted so swiftly and was so severe that Brianna lost consciousness *immediately* or otherwise went into shock and died very quickly." Id. (emphasis in original).

The OCCA, however, rejected Cole's arguments:

We now turn to Appellant's second argument, that the evidence supporting this particular aggravator is insufficient. The evidence on this point is somewhat brief and circumstantial. Therefore, the question of whether the evidence admitted at trial was sufficient for the jury's finding that the murder was preceded by torture of the victim or serious physical abuse is one worthy of considerable deliberation.

Appellant admitted his part in the crime, although his explanation was brief and lacking in helpful details. Appellant originally told authorities that Brianna was crying. Appellant's wife was doing laundry, so he went in to calm her, then went back to playing video games. Later, he described similar events, although on this occasion Appellant did not mention going in to calm his daughter. Rather, his wife noticed she didn't look right, and Appellant came in, looked her over, and said she was fine. Appellant even wrote a statement of this version of the events on the night of the murder, State's Exhibit 1.

The next day, however, authorities first confronted Appellant with the medical examiner's ruling that the death was by homicide. Appellant's first words were, "How many years am I looking at?", thus demonstrating guilty knowledge. Appellant then told a revised version of his story—that he had attempted to get Brianna to stop crying, but she wouldn't; that he then grabbed his daughter by her ankles while she was lying on her stomach, then pushed her legs

46

towards her head, until she flipped over.  The testifying officer, while recounting Appellant's version of the events, physically demonstrates how this was accomplished, but our written record does not adequately reflect what occurred.  But after he did this, Brianna stopped crying, at some point.  Appellant's wife then returned to the room to find Brianna not looking right, and the rest of the events are similar to Appellant's previous explanations.

Appellant also wrote out a statement after this interview, State's Exhibit 2.  Therein, he states, "Brianna was crying so I went into the room to flip her over by grabbing her by the leg and flipping her over backwards."  His wife did not reenter the room for ten to fifteen minutes after the fatal actions.

A fair reading of this record, however, is consistent with the State's description, that Appellant forcefully folded his daughter over until her spine snapped and her aorta tore.

The medical examiner testified that the autopsy revealed Brianna's lumbar spine, the lower part of her back, had been "broken and was splayed open in the front . . . ."  Also, Brianna suffered a "complete tear or what we call a transaction or laceration of the aorta . . . an aorta which is completely torn into two pieces."  The breaking of the spine "can really only occur when there's what we call hyperextension or a bending backward of the back such that it snaps open.  And this doesn't occur with normal bending, but would only occur with . . . abnormal bending backward of the back."  The medical examiner further testified that the injury would take a "great amount of force and a deliberate force."  And the aorta was not severed by the bone breaking.  The medical examiner testified that it is elastic like a rubberband and had been stretched and stretched and stretched until it finally passed the breaking point.  His conclusion, then, was that "we're talking about basically folding the back in half."FN9

> FN9. This testimony makes the autopsy photographs
> highly probative to show both cause of death and the
> conscious physical suffering required by the especially
> heinous, atrocious, or cruel aggravator.

The medical examiner testified that this injury would "absolutely"

47

be painful to a nine-month-old child.  Moreover, he stated "[t]here's no [reason why] unconsciousness would occur instantaneously . . .  It takes a little bit of time for enough blood to leave the vessels and not feed the brain before one becomes unconscious with an injury like that . . . ."  The medical examiner testified that the child was probably conscious for no more than 30 seconds after the spine snapped and that she probably died within two or three minutes.

And so, we have a crying child who is essentially snapped in two by great force at the hands of her father.  She was alive when the painful force was applied and she continued to feel pain for another thirty seconds afterward until she went unconscious and then expired a few minutes later.  The amount of force required was great and the stretching before the breaking of the spine and tearing apart of the aorta would have been protracted and not instantaneous.

The especially heinous, atrocious, or cruel aggravator requires a finding of torture or great physical abuse.  In the DeRosa instruction, torture is further qualified as requiring the infliction of "great physical anguish or extreme mental cruelty" and "serious physical abuse" and "great physical anguish" are further qualified as requiring the victim to experience "conscious physical suffering."

While Brianna Cole suffered a fairly quick death, it was far from painless.  Indeed, the pain was likely excruciatingly horrible.  One cannot read this chilling record without concluding that Brianna suffered both torture and serious physical abuse at the hands of Appellant.  She experienced a heinous death with great conscious suffering to a degree unlike "virtually all murders," thereby placing this crime within the narrowed class of individuals for which capital punishment is a valid option.  Accordingly, we find the evidence admitted at trial, when viewed in a light most favorable to the State, was sufficient to find beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel.  Black v. State, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074; Malicoat v. State, 2000 OK CR 1, ¶ 16, 992 P.2d 383, 397, cert. denied 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000).

Cole I, 164 P.3d at 1098-99 (internal paragraph numbers omitted).

*b) Clearly established federal law applicable to the claim*

48

Cole points to <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), and <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980), as providing the clearly established federal law applicable to this claim. Aplt. Br. at 67. In <u>Jackson</u>, the Supreme Court held "that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." 443 U.S. at 321. The Court further held that in reviewing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319 (emphasis in original).

In <u>Hicks</u>, the petitioner, an Oklahoma state prisoner, was convicted by a jury of unlawfully distributing heroin. Because petitioner had two prior felony convictions, the members of the jury were instructed, in accordance with the then-existing habitual offender statute, that if they found petitioner guilty, they were required to assess a forty-year term of imprisonment. The jury complied with this mandate and imposed the forty-year prison term. Shortly after petitioner was convicted, "the provision of the habitual offender statute under which the mandatory 40-year prison term had been imposed was in another case declared unconstitutional by the [OCCA]." 447 U.S. at 345. "On his appeal, the petitioner sought to have his 40-year sentence set aside in view of the unconstitutionality of

49

this statutory provision." Id. "The [OCCA] acknowledged that the provision was unconstitutional, but nonetheless affirmed the petitioner's conviction and sentence, reasoning that the petitioner was not prejudiced by the impact of the invalid statute, since his sentence was within the range of punishment that could have been imposed in any event." Id.

The Supreme Court "granted certiorari to consider the petitioner's contention that the State deprived him of due process of law guaranteed to him by the Fourteenth Amendment." Id. Although the State of Oklahoma "argued that all that [wa]s involved in th[e] case [wa]s the denial of a procedural right of exclusively state concern," the Court disagreed. "Where," the Court held, "a State has provided for the imposition of criminal punishment in the discretion of the trial jury, . . . [t]he defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." Id. at 346. In turn, the Court held that the OCCA had denied petitioner "the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision." Id. "Such an arbitrary disregard of the petitioner's right to liberty," the Court held, "is a denial of due process of law." Id.

50

*c) Cole's challenge to the OCCA's ruling*

In his federal habeas appeal, Cole first asserts that "the OCCA employed an incorrect appellate standard of review" in assessing "the sufficiency of the evidence supporting the HAC aggravator." Aplt. Br. at 67. Although he concedes the OCCA "applied substantially the same standard of review as the one articulated [by the Supreme Court] in <u>Jackson</u>," he asserts that, "[c]onsistent with Oklahoma law, the OCCA should have applied the reasonable hypothesis standard" discussed in <u>Lay v. Oklahoma</u>, 179 P.3d 615, 623 (Okla. Crim. App. 2008). Aplt. Br. at 68. "The [OCCA's] misapplication of state law," Cole argues, "result[ed] in a deprivation of a liberty interest . . . and is therefore cognizable on federal habeas corpus review" consistent with the holding in <u>Hicks</u>. <u>Id.</u>

We note, at the outset, that Cole has never presented this argument to the Oklahoma state courts and it is therefore unexhausted and subject to an anticipatory procedural bar. <u>See</u> <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." (internal quotation marks omitted)).

Further, even assuming the claim is not procedurally barred, it clearly lacks merit. The "reasonable hypothesis" test cited by Cole was first adopted by the OCCA in 1911 to apply in criminal cases where the only evidence in support of a

51

defendant's guilt was circumstantial.  See Easlick v. State, 90 P.3d 556, 558

(Okla. Crim. App. 2004) (citing Sies v. State, 117 P. 504 (Okla. Crim. App.

1911)).  At that time, the OCCA described the test in the following manner:

> If the facts and circumstances are of such a character as to fairly
> permit an inference consistent with innocence, they cannot be
> regarded as sufficient evidence to support a conviction.  The general
> rule in criminal cases is that, where the evidence is circumstantial,
> the facts shown must not only be consistent with and point to the
> guilt of the defendant, but must be inconsistent with his innocence.

Id. (quoting 117 P. at 505).  At some point thereafter, the "reasonable hypothesis"

test was adopted for use in the second stage of Oklahoma capital cases, and was

incorporated into Oklahoma's uniform jury instructions for capital cases.

In 2004, however, the OCCA "abolish[ed] the 'reasonable hypothesis' test

and adopt[ed] a unified approach[, based upon Jackson,] in examining sufficiency

issues."  Id. at 557.  In doing so, the OCCA noted that the "reasonable

hypothesis" test, which it described as "antiquated," id., "was formed at a time

when circumstantial evidence was universally distrusted," id. at 558.  The OCCA

held that, "given the current instructions defining direct and circumstantial

evidence, the equal footing on which both types of evidence stand, along with the

strength of the reasonable doubt standard, the fear of circumstantial evidence

becomes unfounded."  Id.

In Lay, the case cited by Cole, a capital defendant filed a direct appeal

complaining, in part, "that the trial court erred in failing to instruct the jury [with

52

regard to the "reasonable hypothesis" test] as required by OUJI-CR (2d) 4-77."

179 P.3d at 623.  The trial court had "modified this instruction . . . to conform to

the holding of Easlick," which, as noted, "overruled years of settled law and

abolished the 'reasonable hypothesis' standard in the guilt/innocence instructions

and on appellate review of sufficiency of the evidence claims."  Id.  The OCCA

concluded that, because "Easlick did not address OUJI-CR (2d) 4-77," that was

"still the required instruction for aggravating circumstances proven, entirely or in

part, by circumstantial evidence."  Id.  However, because the defendant in Lay

"failed to object to the instruction as modified," the OCCA concluded there was

no plain error.  Id.

Seven years later, in Harmon v. State, 248 P.3d 918, 938-939 (Okla. Crim.

App. 2011), the OCCA expressly abolished the "reasonable hypothesis" test as

applied to second-stage jury instructions regarding aggravating circumstances.  In

doing so, the OCCA noted that the reasons it outlined in Easlick for abandoning

the "reasonable hypothesis" test for guilt/innocence instructions "appl[ied] to"

second-stage aggravating circumstance instructions "as well."  Id. at 938.  Thus,

under current Oklahoma law, the Jackson standard applies equally to a jury's

first-stage guilt/innocence determinations and its second-stage aggravating

circumstance determinations.

Notably, the trial court in Cole's case, consistent with then-existing

Oklahoma law, instructed the jury regarding the "reasonable hypothesis" test as

53

part of its second-stage instructions regarding the aggravating circumstances alleged by the prosecution. In particular, the trial court instructed the jury that, "[i]n order to warrant a finding of any aggravating circumstance or circumstances upon circumstantial evidence, each fact necessary to prove the existence of the circumstance must be established by the evidence beyond a reasonable doubt," and that "[a]ll of the facts and circumstances, taken together, must be inconsistent with any reasonable theory or conclusion other than the existence of the aggravating circumstance." State ROA, Vol. III at 464.

Although the OCCA did not in turn apply the "reasonable hypothesis" test in conducting its appellate review of the sufficiency of the evidence supporting the heinous, atrocious or cruel aggravator, its failure to do so was not contrary to Hicks, nor did it otherwise deprive Cole of his right to due process. Indeed, Hicks, which involved a defendant who was effectively deprived of the right to have a jury exercise its discretion to impose a sentence on him, is not remotely on point. Further, our review of OCCA case law indicates that the OCCA, at the time it decided Cole's direct appeal, routinely applied the Jackson standard, rather than the "reasonable hypothesis" test, in assessing the sufficiency of evidence supporting a heinous, atrocious or cruel aggravator. E.g., Black v. State, 21 P.3d 1047, 1074 (Okla. Crim. App. 2001); Malicoat v. State, 992 P.2d 383, 397 (Okla. Crim. App. 2000). Finally, and most importantly, the OCCA applied the proper constitutional standard in assessing the sufficiency of the evidence supporting the

54

jury's second-stage findings in Cole's case (Cole concedes that the OCCA effectively applied the constitutional standard of review outlined in Jackson). Consequently, Cole's due process rights were not violated by the manner in which the OCCA conducted its appellate review on that issue.

Finally, we conclude that the OCCA's decision was neither contrary to, nor an unreasonable application of, Jackson. In particular, we fully agree with the OCCA that the medical examiner's testimony was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel.

*Prosecutorial misconduct*

In Proposition Five of his appellate brief, Cole asserts that prosecutorial misconduct in seeking sympathy for the decedent, by way of repeated references to God and religion in both stages of the trial, resulted in violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Cole further asserts that his rights under the First Amendment were also violated by the prosecutorial misconduct. Additionally, Cole asserts, as part of Proposition Five, that his trial counsel was ineffective for failing to object to the alleged instances of prosecutorial misconduct.

*a) Facts pertaining to the claim*

Cole alleges that the prosecution "presented argument designed to inflame the passions and prejudice of the jury and evoke sympathy for Brianna by

55

repeatedly injecting religion and God into the trial." Aplt. Br. at 76. In support,

Cole first notes that the lead prosecutor, during first-stage opening statements and

closing arguments, made repeated references to Christmas:

> • "Brianna Victoria Cole was born March 27th of 2002 and five days, five days before her first Christmas she was dead. Four days before her first Christmas she was laying on an autopsy table." ROA, Vol. VI at 57 (opening statement).

> • "Four days before Christmas, Dr. Sibley [the medical examiner] will testify that he performed an autopsy on this little girl." Id. at 60.

> • "Dr. Sibley . . . will testify that . . . this little girl could not even make it to her first Christmas." Id. at 63.

> • "There's no Oklahoma statute that says you have to buy your child a birthday present. Or in Brianna's case, a Christmas present." Id., Vol. VII at 43 (closing argument).

Cole next asserts that the prosecutor, during first-stage closing arguments,

"dove head first into religion, God, and how children are a blessing," Aplt. Br. at

48, by stating:

> • "But if you look at any mother-father, mother, father, grandparent, guardian that is blessed enough to have a little baby that is perfect, what would they give for that child?" ROA, Vol. VI at 42-43.

> • "Cole received one of the most precious gifts that anyone can receive. Cars are nice. Houses are nice. Careers are great. There's no better gift than a healthy child. None. And as I sit down after this first closing, I will not ask what type of man would do this to a baby. As I said in the beginning of this closing, it was his duty to protect that little girl. God entrusted him with that little girl and what did he do with that trust?" Id. at 48.

According to Cole, "[t]hese statements were not designed to . . . highlight

important points, evidence, or testimony," Aplt. Br. at 77, but rather "were

designed to inflame the passions and prejudices of the jury, to convict Cole not

based on Oklahoma law, but because Cole violated God's law; broke God's trust;

and was an affront to God because the homicide occurred five days before we

celebrate the birth of God's son," id. at 78.

Cole contends that "the prosecutor continued down this same path during

second stage closing arguments," id., when he described a personal incident to the

jury:

> I remember once, after going on a long trip – and my older two
> children were 14 months apart.  It was like one of those trips that
> everything went pretty well and then you finally get there and decide
> you need to haul everything in, you know.  And I don't know about
> other people's experience, but mine always were whenever you got to
> where you were going and you were tired, they weren't.  So anyhow,
> we go hauling into my mom and dad's house and take the babies in
> and, you know, clean them up and get the wonderful – you know, the
> grapes that you stopped in Missouri and got but you don't know why,
> since they're all purple at that point.  So anyhow, we got up there
> and I remember getting the kids cleaned up, putting their PJ's on.
> Well, there was no reason to put their PJ's on because they were
> wide awake, you know.  So after messing around for awhile, they
> finally go to sleep.  And then I got out of the shower, I laid down and
> I know just as my head hit the pillow I heard one of them cry, you
> know.  So I got up and my dad looks at me and he says, he goes, you
> know what a baby's cry is?  And I looked at him.  I'm like I know
> you're going to tell me.  Okay, what is a baby's cry?  And he said a
> baby's cry is God asking you to help them.
>
> My dad loved babies.  There was nothing – there was nothing
> more important to my father than when we went up there to visit of
> grabbing one of the little babies and he would just walk in the yard
> with them and he would talk to them.  And I remember – he's gone
> now, but I remember when we sat there, you know, the horrible times

when you have to make final arrangements for them and you're happy and sad and you cry and you laugh. And you know, looked at me and they said, Patrick, you know, what do you want to say? I said I don't know. You know, he loved babies. And that was it.

Trial Tr., Vol. VIII at 144-45.

Cole asserts that "[t]he religious overtones and content of the prosecutor's argument acted to obliterate the separation between church and state in violation of [his] rights under the First Amendment." Aplt. Br. at 79. The prosecutor's arguments, Cole asserts, "blurred the distinction between Oklahoma law and Christian religion," and resulted in "the jury's determination [being] based upon Cole's purported affront to God." Id.

Lastly, Cole asserts that his trial counsel "failed to object [to any of this misconduct] and allowed this highly prejudicial and sympathetic evidence to be heard by Cole's jury." Aplt. Br. at 81.

*b) The OCCA's ruling on the issue*

Cole asserted some, but not all, of these arguments in Proposition Five of his direct appeal brief. In particular, Cole framed Proposition Five in the following manner: "PROSECUTORIAL MISCONDUCT IN SEEKING SYMPATHY FOR THE DECEDENT VIOLATED COLE'S RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, SECTIONS 7

58

AND 20 OF THE OKLAHOMA CONSTITUTION." Direct Appeal Br. at 54

(capitalization in original). In turn, Cole pointed to the same instances of alleged

misconduct that he now complains of in these federal habeas proceedings.

Although Cole argued that the misconduct violated his right to a fair trial and

sentencing proceeding, he did not argue that his First Amendment rights were

violated.

As for his claim of ineffective assistance, it was asserted only in a footnote

to his discussion of the alleged prosecutorial misconduct:

> Trial counsel made no objection to these improper arguments and
> thus this Court must review for plain error. To be entitled to relief
> under the plain error doctrine, the defendant must prove: 1) the
> existence of an actual error; 2) that the error is plain or obvious; and
> 3) that the error affected his substantial rights, meaning the error
> affected the outcome of the proceeding. If these elements are met,
> this Court will correct plain error only if the error seriously affects
> the fairness, integrity, or public reputation of the judicial
> proceedings. Cole asserts that plain error is present in this claim and
> reversal is warranted. In addition, Cole asserts that plain error
> review can be avoided because Cole received ineffective assistance
> of counsel because of trial counsel's failure to object to these plain
> errors in violation of the Sixth and Fourteenth Amendments to the
> United States Constitution as well as article II, §§ 7 and 20 of the
> Oklahoma Constitution.

Direct Appeal Br. at 55-56, n.10 (internal citations, quotation marks, and brackets

omitted).

The OCCA rejected Cole's prosecutorial misconduct claim, stating as

follows:

In proposition five, Appellant claims prosecutorial misconduct in

59

seeking sympathy for the decedent violated his right to a fundamentally fair trial and sentencing proceeding in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, Sections 7 and 20 of Oklahoma's Constitution.

Appellant points to four brief examples from the nine-day trial. First, during first stage opening statement the prosecutor made two references about the death occurring just prior to what would have been Brianna's "first Christmas." No objection was made to the comment, and we find no error, plain or otherwise. The occurrence of this murder on the week before Christmas is a tragic circumstance that is instantaneously obvious to everyone, this Court included. Certain facts simply cannot be disentangled from a criminal trial on the basis that they also evoke sympathy.

Next, Appellant points to first stage closing arguments, when the prosecutor argued that children are a blessing, one that most parents, grandparents, etc. would give anything for and value highly. No objection was made, however, and for good reason. These comments fall within the wide latitude of discussion permitted both the state and the defense in closing argument. Short v. State, 1999 OK CR 15, ¶ 72, 980 P.2d 1081, 1104.

Next, Appellant points to brief comments at the end of first stage closing arguments when the prosecutor argued that children are a precious gift, entrusted to parents by God. Again, no objection was raised, and we find no plain error. Simpson v. State, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 692–93. It is probably safe to say that most Americans, probably a strong majority, would agree with this statement wholeheartedly. While the statement is perhaps objectionable, as possibly injecting God into the mix and for its intentional melodrama, it does not, standing alone, amount to plain error.

Appellant's last example, which occurred during the prosecutor's penalty phase closing, concerns the prosecutor's story of how his father told him that a "baby's cry is God asking you to help them," along with a later reference to an earlier unobjected to description of the victim as God's gift. No objections were made by defense counsel. Again, we find no plain error. While the sentimental

60

statement [sic] above were, in our opinion, slightly beyond that "wide latitude" given to parties to discuss the evidence and make reasonable arguments therefrom, Appellant's trial or sentencing was not rendered unfair by these last remarks, or when all of the examples are considered together. The record indicates that Appellant was himself responsible for injecting religion into this trial by his bizarre behavior, so much so that his counsel, at times, had to do their best to convince jurors that Appellant was simply a devout man, rather than a troubling zealot. In context, then, the prosecutors' brief arguments about God were no more than an adversarial balance to Appellant's positions on religion.

Cole I, 164 P.3d at 1096-97 (internal paragraph numbers omitted). The OCCA did not mention Cole's allegation of ineffective assistance of trial counsel. Nor did the OCCA discuss whether the alleged prosecutorial misconduct violated Cole's First Amendment rights.

*c) Clearly established federal law applicable to the prosecutorial misconduct claim*

Prosecutorial misconduct can result in constitutional error in one of two ways. "First, prosecutorial misconduct can prejudice 'a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.'" Matthews v. Workman, 577 F.3d 1175, 1186 (10th Cir. 2009) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Second, absent the infringement of a specific constitutional right, prosecutorial misconduct can result in constitutional error if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. In other words, in the habeas context, the petitioner must establish that the

61

prosecutor's misconduct was "of sufficient significance to result in the denial of the [petitioner]'s right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987) (internal quotation marks omitted).  In considering whether a habeas petitioner has satisfied this standard, the offending prosecutorial remark or action must be placed in the context of the whole trial, and not viewed in isolation.  Id. at 765-66.

Notably, Cole does not cite to Donnelly or Greer.  Instead, he cites to several other Supreme Court cases, as well as circuit cases.  But none of the Supreme Court cases cited by Cole are remotely on point.  And, as we have noted, circuit cases are inapplicable in our determination of whether the OCCA's rulings were contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)(1).  Consequently, we will treat Donnelly and Greer as the "clearly established federal law" applicable to Cole's claim for purposes of § 2254(d)(1) analysis.

*d) Cole's challenge to the OCCA's analysis of the prosecutorial misconduct*

In challenging the OCCA's analysis and rejection of his claims, Cole begins by asserting it was "unreasonable" for the OCCA to find that "'the occurrence of th[e] murder on the week before Christmas [wa]s a tragic circumstance that [wa]s instantaneously obvious to everyone" and that could not "'be disentangled from a criminal trial on the basis that they also evoke sympathy.'"  Aplt. Br. at 83 (quoting Cole I, 164 P.3d at 1101).  More

62

specifically, Cole argues that "[w]hile it is painfully obvious that Brianna was killed days before Christmas, there was absolutely no need for the prosecutor to continually emphasize that fact." Id. at 83-84. "The prosecutor's arguments," Cole asserts, "pulled on the heart strings of the jury by placing before it God's gifts and blessing – children, particularly healthy and 'perfect' children (like Brianna), and God's gift of his Son who gave us all eternal life – counterposed with Cole's action of killing this 'blessing' from God, and giving the gift of death." Id. at 84.

Focusing solely on the prosecutor's references to the timing of the murder in proximity to Christmas, we are not persuaded that the OCCA's analysis was contrary to, or an unreasonable application of, Donnelly or Greer. As the OCCA noted, the fact that Brianna's death occurred just days before Christmas was obvious to the jury. Further, although Cole suggests that the prosecutor "continually emphasize[d] that fact," in actuality the prosecutor made only two references to this fact during his first-stage opening statement. Considering the trial as a whole, which lasted over a week, these references were not of sufficient significance to deprive Cole of his right to a fair trial.

As for the prosecutor's references during first-stage closing arguments to children being a blessing or gift from God, the OCCA concluded that "[t]hese [blessing] comments f[e]ll within the wide latitude of discussion permitted both the state and the defense in closing argument." Cole I, 164 P.3d at 1101. The

63

OCCA also concluded that "[i]t is probably safe to say that most Americans, probably a strong majority, would agree . . . wholeheartedly" with the prosecutor's suggestion that children are a "gift" from God. Id. Although the OCCA conceded that this statement from the prosecutor was "perhaps objectionable, as possibly injecting God into the mix and for its intentional melodrama," it concluded that the statement, "standing alone, [did not] amount to plain error." Id.

Cole argues that "[t]his finding is unreasonable because the question is not whether [he] violated God's laws and trust, but whether [he] violated the laws of Oklahoma." Aplt. Br. at 84. While Cole is certainly correct in stating that the proper question before the jury was whether he violated Oklahoma law, we conclude that the OCCA's analysis of this prosecutorial comment was neither contrary to, nor an unreasonable application of, Donnelly or Greer. Although the comment was certainly melodramatic and likely improper, we are not persuaded, after reviewing the entire trial transcript, that the comment resulted in a deprivation of Cole's due process right to a fair trial. In particular, it was not seriously disputed that Cole was guilty of causing Brianna's death. Likewise, the jury's second-stage findings regarding the aggravating factors, and its determination that a sentence of death was warranted, were more than amply supported by the evidence. Indeed, the evidence supporting the aggravating factors was quite powerful, if not overwhelming. Lastly, there is no dispute that

64

the jury was properly instructed regarding its tasks in both the first and second stages of trial.

Finally, Cole argues that it was unreasonable for the OCCA to conclude that Cole, through his behavior during trial, injected religion into the trial and that the prosecutor's arguments about God were nothing more than an "adversarial balance" to Cole's positions on religion. We construe the OCCA's comments as addressing not only the prosecutor's remarks from the first-stage proceedings, but also the prosecutor's comments in second-stage closing arguments, including notably the comments regarding a baby's cry and what God asks from parents. See Cole I, 164 P.3d at 1101 (finding that neither "[Cole's] trial [n]or sentencing" was "rendered unfair" "or when all of the examples [we]re considered together"). Nevertheless, Cole cannot prevail on this challenge. Although we agree with Cole that "at no time did [he] or his attorneys present any evidence of [his] position on religion, or [his] religious views, or assert [his] religiousness as a defense," Aplt. Br. at 85, we nevertheless conclude, for the reasons already discussed above, that the prosecutor's comments, when considered in light of the trial as a whole, see Cole I, 164 P.3d at 1101, did not result in a deprivation of Cole's due process right to a fair trial and sentencing proceeding.

*e) Cole's ineffective assistance claim*

As for Cole's assertion that his trial counsel was ineffective for failing to object to the alleged instances of prosecutorial misconduct that occurred during

65

the trial, our review of the state court record leads us to conclude that Cole did not properly raise the issue on direct appeal. OCCA Rule 3.5 outlines the requirements of an appellant's brief, and subsection (A)(5) thereof specifically provides that "[m]erely mentioning a possible issue in an argument or citation to authority does not constitute the raising of a proposition of error on appeal." OCCA R. 3.5(A)(5). That same subsection further provides that "[f]ailure to list an issue pursuant to the[] requirements [of the rule] constitutes waiver of alleged error." Id. In Cole's case, his claim of ineffective assistance was neither listed nor treated as a distinct issue in his direct appeal brief. Rather, as we have noted, the issue was mentioned by Cole in one sentence in a footnote to his discussion of the alleged prosecutorial misconduct. In turn, the OCCA did not acknowledge, let alone address, the issue in disposing of Cole's direct appeal, and it thus appears, consistent with OCCA Rule 3.5(A)(5), to have treated the issue as not properly raised. Consequently, the issue is unexhausted and, in turn, procedurally barred for purposes of federal habeas review.[13]

*Cumulative error*

In his sixth and final proposition of error, Cole asserts that the cumulative

---

[13] Even if the issue was not waived and we were somehow free to review the issue de novo, we would conclude there is no merit to it. In short, we are not persuaded there is a reasonable probability that the outcome of either stage of Cole's trial proceedings would have been different had Cole's trial counsel objected to the prosecutor's comments.

effect of the errors that occurred at his trial deprived him of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. "In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Alverson v. Workman, 595 F.3d 1142, 1162 (10th Cir. 2010) (internal quotation marks and brackets omitted).[14]

Having reviewed all of the state court records in this case, we conclude that, notwithstanding the constitutional errors alleged by Cole in these federal habeas proceedings, Cole received a fundamentally fair trial. In other words, even aggregating the constitutional errors alleged by Cole, we conclude that those errors did not have a substantial and injurious effect or influence on either the jury's determination of Cole's guilt or its decision to sentence Cole to death. See generally Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (outlining the harmless error standard to be applied on federal habeas review).

## III

The judgment of the district court is AFFIRMED. Cole's motion to expand

---

[14] In Hooks, 689 F.3d at 1194 n.24, we "note[d] that there is a split in the circuits on whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1)." We also noted that Tenth Circuit "precedent may very well signal where our court has come down on this issue—viz., that cumulative-error analysis is clearly established law." Id. We need not resolve that question in this case.

the certificate of appealability is DENIED.